Andrew Rozynski, Esq.
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, NY 10003
212-353-8700 (tel.)
917-591-2875 (fax)
arozynski@eandblaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAMANTHA DIAZ,<br><br>       *Plaintiff*,<br><br>v.<br><br>BRONXCARE HEALTH SYSTEM,<br><br>       *Defendant*. | **Civil Action No.: 21-8924**<br><br>**COMPLAINT** |

Plaintiff Samantha Diaz ("Plaintiff"), by and through her undersigned counsel, Eisenberg & Baum, LLP, as and for her Complaint against Defendant BronxCare Health System ("Defendant" or the "Hospital"), hereby alleges as follows based upon personal knowledge and information and belief:

## INTRODUCTION

1. This case is about equal access to information and health care services. Language is the cornerstone of the patient-physician relationship. Indeed, "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988), https://bit.ly/2Fn3zLW. Effective communication provides better patient safety, better treatment adherence, and better healthcare outcomes. Without effective

communication, a patient cannot make informed healthcare choices.

2. Plaintiff Samantha Diaz is deaf, and her primary language is American Sign Language ("ASL"). As such, she requires an ASL interpreter to effectively communicate and participate in a health care setting.

3. Plaintiff's claims arise from her hospitalization at the BronxCare Health System hospital, formerly known as Bronx-Lebanon Hospital Center, from November 27, 2018 to December 4, 2018. During her week-long stay, Plaintiff made repeated requests for ASL interpreters to communicate with her caregivers and to understand and participate in her treatment for dire health issues. Despite these requests, Defendant never provided or offered Plaintiff any interpreter or any other auxiliary aid or service.

4. Plaintiff initially sought treatment at the Hospital's emergency department for severe anemia after a meeting with her OB/GYN to discuss her plan to have a baby.

5. While at the Hospital, Defendant diagnosed Plaintiff with human immunodeficiency virus ("HIV"). Defendant failed to provide Plaintiff with an interpreter or any other auxiliary aid and service when diagnosing Plaintiff with HIV, which caused Plaintiff severe emotional distress.

6. Defendant unlawfully discriminated against Plaintiff by refusing to provide the ASL interpreters she required to understand and participate in her health care, despite knowing at all relevant times that she is deaf and repeatedly requested ASL interpreters.

7. Based on Plaintiff's experience, it is evident that Defendant has failed to implement proper policies, procedures, and practices respecting the civil rights and communication needs of deaf individuals who primarily communicate in ASL. Plaintiff brings this lawsuit to compel Defendant to cease its unlawful discriminatory practices and implement policies and procedures

that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for deaf individuals to participate in and benefit from Defendant's health care services.

8. Plaintiff brings this action seeking declaratory and injunctive relief; non-economic nominal, compensatory, and punitive damages; and attorneys' fees and costs to redress Defendant's unlawful discrimination against her on the basis of her disability in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; the New York Human Rights Law ("NYHRL"), N.Y. Exec. L. § 290 et seq.; the New York Civil Rights Law ("NYCRL"), N.Y. Civ. Rights Law §§ 40-c & 40-d; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.

## THE PARTIES

9. Plaintiff Samantha Diaz is a resident of Brooklyn, New York, who is substantially limited in the major life activities of hearing and speaking. Thus, she is a qualified individual with a "disability" within the meaning of federal civil rights laws.

10. Defendant BronxCare Health System has at all relevant times been a not-for-profit corporation organized and operating within the State of New York and maintaining a registered agent and address for services at c/o The Corporation, attn.: President and CEO, 1276 Fulton Ave., Bronx NY 10456. Upon information and belief, Defendant receives and accepts federal financial assistance, including but not limited to Medicare and/or Medicaid reimbursements, and is a public accommodation within the meaning of state and city civil rights laws.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under the laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state and city law.

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and the conduct giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

13. Plaintiff Samantha Diaz is a 30-year-old individual who is profoundly deaf and communicates primarily in ASL. English is a secondary language for her.

14. Ms. Diaz cannot effectively communicate by reading a person's lips, vocalizing, or exchanging written notes in English for all communications, especially those involving medical terminology.

15. On November 26, 2018, Plaintiff went to an OB/GYN appointment at the Hospital to discuss recent chest and body pain and to discuss her plan to have a baby in the near future. Accordingly, Plaintiff had blood work drawn.

16. Late that evening, Hospital staff contacted Ms. Diaz and told her to immediately return to the emergency department because her blood count levels indicated severe anemia.

17. Ms. Diaz, who utilizes a video relay service to allow her to communicate with voice telephone users through video equipment[1], requested an ASL interpreter during this call so that there would be an ASL interpreter when she arrived. However, Hospital staff informed Ms. Diaz that she would have to request an interpreter in-person upon arriving at the emergency department.

18. Accordingly, in the early morning on November 27, Plaintiff, feeling weak, in pain, and having difficulty walking, returned to the Hospital and went to the emergency department.

19. Upon arriving, Plaintiff requested an ASL interpreter in-person but was told by Hospital staff that there were no interpreters available overnight.

20. Eventually, Plaintiff was admitted to the Hospital for severe anemia.

---

[1] *See* https://www.fcc.gov/consumers/guides/video-relay-services.

21. Plaintiff remained in the hospital for seven days and Hospital staff failed to secure an ASL interpreter throughout the entirety of Plaintiff's stay at the Hospital.

22. During Plaintiff's stay at the Hospital, staff informed Plaintiff that she had been diagnosed as HIV+.

23. Plaintiff could not understand how, when, or where she could have contracted HIV. Additionally, Plaintiff had numerous questions regarding medication and life expectancy of a person living with HIV. But because of the absence of any effective auxiliary aid or service, Plaintiff could not effectively communicate those thoughts and questions with Hospital staff.

24. Instead, Plaintiff fell into a deep depression during her stay.

25. Plaintiff repeated her requests for ASL interpreters to doctors and other Hospital staff throughout her entire stay.

26. Plaintiff's aunt also repeatedly requested ASL interpreters from Hospital staff on Plaintiff's behalf during her stay.

27. Regardless, at no point did the Hospital ever provide or offer any auxiliary aid to allow Plaintiff to understand and participate in her urgent medical care, even when Plaintiff was diagnosed with HIV and when she met with a specialist to discuss prolonging her life while living with HIV.

28. Plaintiff was never even offered video remote interpreting ("VRI")[2] to commute with her caregivers regarding her severe anemia or her HIV+ diagnosis.

29. Instead, Plaintiff was forced to attempt to use her voice, read lips, write notes back and forth in English, and have her mother and best friend speak for her to communicate with

---

[2] VRI is "an interpreting service that [should] use[] video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images." 28 C.F.R. § 36.104.

Hospital staff.

30. Despite Plaintiff's repeated requests ASL interpreters during her week-long hospitalization, Defendant never once provided Plaintiff with any auxiliary aid.

31. The exigent circumstances of Plaintiff's visit and subsequent HIV+ diagnosis were such that effective communication could not have taken place between Plaintiff and Hospital staff without the aid of a qualified ASL interpreter.

32. Indeed, as a result of Defendant's failure to provide effective auxiliary aids and services, Plaintiff was not able to fully understand Hospital staff during Plaintiff's treatment for severe anemia; the extent and circumstances of her health problems; the extent and circumstances of her HIV+ diagnosis; the purposes of the treatments provided to her for her anemia and her HIV+ diagnosis; the common risks and/or benefits of those treatments; the common risks, side effects, and benefits of medications given; the specific dosage instructions for medications given; the existence of any alternative treatments; the approximate length of care; the potential side effects of stopping treatment the details of any aftercare or discharge instructions; etc.

33. To date, Plaintiff has still many unanswered questions surrounding the HIV+ diagnosis she received from the Hospital.

34. Defendant's discrimination against Plaintiff, and Plaintiff's resulting lack of understanding as to medical care and diagnosis of a severe and often fatal illness, caused Plaintiff to suffer humiliation, anger, frustration, stress, anxiety, and emotional distress.

35. Upon information and belief, Defendant and its employees follow the recommendations and regulations of the Joint Commission.

36. Upon information and belief, Defendant and its employees follow the recommendations for effective communication in the Joint Commission's Advancing Effective

Communication, Cultural Competence, and Patient- and Family-Centered Care: A Roadmap for Hospitals, https://bit.ly/3usVEEh ("A Roadmap for Hospitals").

37. Consistent with the Joint Commission's guidance, Defendant has a responsibility to "develop a system to provide language services to address the communication needs of patients whose preferred language is not English, including patients who communicate through sign language." A Roadmap for Hospitals at page 40, https://bit.ly/3usVEEh.

38. Defendant has a responsibility to identify a "patient's preferred language for discussing health care." *Id.* at 10, https://bit.ly/3usVEEh.

39. If necessary to determine a patient's preferred language, Defendant should "[a]rrange for language services to help identify the patient's preferred language," and once the preferred language is identified, Defendant should "[n]ote the patient's preferred language for health care discussions in the medical record and communicate this information to staff." *Id.* at 10, https://bit.ly/3usVEEh.

40. The Joint Commission requires hospitals like Defendant to "[p]rovide an interpreter for the patient's preferred language during informed consent discussions, even if the hospital provides translated materials, to facilitate patient communication." *Id.* at 20, https://bit.ly/3usVEEh.

41. As advised by the Joint Commission, Defendant is aware that "[e]xchanging written notes . . . will likely be effective communication for brief and relatively simple face-to-face conversations." *Id.* at 69, https://bit.ly/3usVEEh.

42. Similarly, Defendant is aware that "[w]ritten forms or information sheets may provide effective communication in situations with little call for interactive communication, such as providing billing and insurance information or filling out admission forms and medical history

inquiries." *Id.*, https://bit.ly/3usVEEh.

43. New York state's emergency-interpreter law requires Defendant to provide "patients in the emergency service" like Plaintiff an interpreter "within 10 minutes of a request by the patient [or] the patient's family." 10 N.Y.C.R.R. § 405.7(a)(7)(ix)(a).

44. Defendant and Defendant's staff knew that Plaintiff is deaf and were aware that Plaintiff made repeated requests for full-time in-person interpreters.

45. Defendant also knew or should have known of its obligation as a health care provider under the ACA to develop policies and promote compliance with these statutes and to provide reasonable accommodations, including but not limited to the provision of in-person ASL interpreters and/or VRI to ensure effective communication with deaf persons.

46. Defendant and its staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiff greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

47. Nonetheless, Defendant prevented Plaintiff from benefitting from its services by failing to provide the ASL interpreters necessary for her full participation in and understanding of her care and her HIV diagnosis.

48. In doing so, Defendant intentionally discriminated against Plaintiff and acted with deliberate indifference to her federally protected rights.

49. Defendant's wrongful and intentional discrimination against Plaintiff on the basis of her disability is reflected by Defendant's failure to train employees and promulgate policies of non-discrimination against deaf individuals.

50. As a result of Defendant's failure to ensure effective communication with Plaintiff, Plaintiff received services that were objectively substandard and that were inferior to those

provided to patients and companions who are hearing.

51. Plaintiff is entitled to equal access to services offered by Defendant as are enjoyed by non-disabled persons.

52. Defendant is one of the largest hospital systems in the Bronx.[3] Plaintiff's doctors work for Defendant and Plaintiff has appointments that she needs to schedule with those doctors. Plaintiff frequently visits her family and friends in the Bronx and still wishes to access Defendant's services and receive care in Defendant's facilities as the need will likely arise, but Plaintiff is deterred from doing so because of Defendant's discrimination against her on the basis of her disability.

## CAUSES OF ACTION

**COUNT I: Violations of Section 1557 of the Patient Protection and Affordable Care Act**

53. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

54. At all times relevant to this action, the ACA has been in full force and effect and has applied to Defendant's conduct.

55. At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the ACA, 42 U.S.C. § 18116.

56. At all times relevant to this action, Defendant received federal financial assistance, including Medicare and Medicaid reimbursements, and has been principally engaged in the

---

[3] *See* BronxCare Health System, About Us - General Overview, https://bronxcare.org/about-us/general-overview/ ("BronxCare is the largest voluntary, not-for-profit health and teaching hospital system serving the South and Central Bronx, with 859 beds and more than 4,500 employees.").

9

business of providing health care.  Thus, Defendant is a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

57. Under the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116.

58. Federal regulations implementing the ACA provide that a covered entity "shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with the standards found at 28 CFR 35.160 through 35.164." 45 C.F.R. § 92.102(a).

59. Accordingly, federal regulations implementing the ACA also provide that a "[covered] entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.  28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.102(a).

60. Federal regulations implementing the ACA further require that a covered entity that provides individuals with disabilities "qualified interpreters via VRI services shall ensure that it provides–(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not

produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 35.160 (*cited by* 28 C.F.R. §§ 35.104 & 36.303(f); in turn *cited by* 45 C.F.R. § 92.102(b)(1)(i)).

61. At all times relevant to this action, Plaintiff's primary language for communication has been ASL, and she has a limited ability to read, write, speak, or understand English. Plaintiff is thus also an individual with limited English proficiency within the meaning of the ACA.

62. Indeed, the ACA regulations governing individuals with disabilities and individuals with limited English proficiency contain virtually identical definitions, prohibitions, and requirements. For example, compare 45 C.F.R. § 92.102(b)(2)(i)–(iii) regarding the provision of interpreters to individuals with disabilities:

> When an entity is required to provide an interpreter . . . the interpreting service shall be provided to individuals free of charge and in a timely manner, via a remote interpreting service or an onsite appearance, by an interpreter who
>
> (i) Adheres to generally accepted interpreter ethics principles, including client confidentiality; and
>
> (ii) Is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, terminology and phraseology;

with 45 C.F.R. § 92.101(b)(3)(i)(A)–(C) regarding the provision of interpreters with limited English proficiency:

> [Interpreter services] must be provided by an interpreter who:

  (A) Adheres to generally accepted interpreter ethics principles, including client confidentiality;

  (B) Has demonstrated proficiency in speaking and understanding at least spoken English and the spoken language in need of interpretation; and

  (C) Is able to interpret effectively, accurately, and impartially, both receptively and expressly, to and from such language(s) and English, using any necessary specialized vocabulary, terminology and phraseology.

63. During Plaintiff's visits to Defendant's Hospital in 2018, federal regulations implementing the ACA provided that (1) a "covered entity shall offer a qualified interpreter to an individual with limited English proficiency when oral interpretation is a reasonable step to provide meaningful access for that individual with limited English proficiency" and (2) a "covered entity shall use a qualified translator when translating written content in paper or electronic form." 45 C.F.R. § 92.201(d)(1)–(2).

64. Since August 2020, federal regulations implementing the ACA similarly provide that a covered entity "shall take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals," 45 C.F.R. § 92.101(a), and that where an individual "requires the provision of language assistance services, such services must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency. Language assistance services may include: (i) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency; and (ii) Written translation, performed by a qualified translator, of written content in paper or electronic form into languages other than English." 45 C.F.R. § 92.101(b)(2)(i)–( iv).

12

65. Federal regulations implementing the ACA further provide that "[n]othing in this section shall be construed to require an individual with limited English proficiency to accept [the] language assistance services" provided. 45 CFR § 92.101(c).

66. As set forth above, Defendant discriminated against Plaintiff on the basis of her disability in violation of the ACA and its implementing regulations.

67. The ACA, by incorporating the enforcement mechanism of the RA, extends a cause of action to Plaintiff–that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act.  42 U.S.C. § 18116(a).

68. Defendant has failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

69. Plaintiff is entitled to declaratory and injunctive relief, attorneys' fees, costs, and disbursements, nominal damages, and compensatory damages for the injuries and loss she sustained as a result of Defendant's discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

**COUNT II: Violations of the New York Human Rights Law**

70. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

71. At all times relevant to this action, the NYHRL, Article 15 of the New York Executive Law § 290 et seq., has been in full force and effect and has applied to Defendant's conduct.

72. At all times relevant to this action, Plaintiff has had substantial impairments to the major life activities of hearing and speaking and has been a qualified individual with a disability within the meaning of the NYHRL, N.Y. Exec. L. § 292(21).

73. At all times relevant to this action, Defendant's facility has been a place of public accommodation within the meaning of the NYHRL, N.Y. Exec. L. § 292(9).

74. Pursuant to N.Y. Exec. L. § 296(2)(a), "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the . . . disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, . . . to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of . . . disability . . . or that the patronage or custom thereat of any person of or purporting to . . . having a disability is unwelcome, objectionable or not acceptable, desired or solicited."

75. Pursuant to N.Y. Exec. L. § 296(2)(c), discrimination includes the "refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities."

76. Defendant discriminated against Plaintiff on the basis of her disability in violation of the NYHRL.

77. Plaintiff is therefore entitled to declaratory and injunctive relief, and nominal and compensatory damages for the injuries and loss she sustained as a result of Defendant's discriminatory conduct as hereinbefore alleged pursuant to the NYHRL, N.Y. Exec. L. § 297(9).

**COUNT III: Violations of the New York Civil Rights Law**

78. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

79. At all times relevant to this action, the NYCRL has been in full force and effect and has applied to Defendant's conduct.

80. The NYCRL prohibits disability discrimination as contemplated by the NYSHRL. *See* N.Y. Civ. Rights Law §§ 40-c & 40-d; N.Y. Exec. L. § 296(2); *see also Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 350 (E.D.N.Y. 1997) ("Facts sufficient to state a cause of action under New York Executive Law section 296 will support a cause of action under section 40-c of the Civil Rights Law.") (citations omitted).

81. Because of Defendant's discrimination against Plaintiff on account of her disability, Defendant is liable "for each and every violation" of "a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby in any court of competent jurisdiction in the county in which the defendant shall reside." N.Y. Civ. Rights Law § 40-d; *see also Ganzy*, 995 F. Supp. at 350 ("A valid cause of action based on a violation of section 296 of the New York Executive Law exposes the defendant to civil penalties under Section 40-c of the New York Civil Rights Law, recoverable by the person aggrieved.") (citing, inter alia, N.Y. Civ. Rights Law § 40-d).

82. "At or before the commencement of [this] action under this section," notice was provided to the New York Attorney General. N.Y. Civ. Rights Law § 40-d.

83. Based on the foregoing, Plaintiff is entitled to all remedies available for violations of the NYCRL.

**COUNT IV: Violations of the New York City Human Rights Law**

84. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

85. At all times relevant to this action, the NYCHRL, N.Y.C. Admin. Code § 8-101 et

seq., has been in full force and has applied to Defendant's conduct.

86. At all times relevant to this action, Plaintiff has had substantial impairments to the major life activities of hearing and speaking and has been a qualified individual with a disability within the meaning of N.Y.C. Admin. Code § 8-102.

87. At all times relevant to this action, Defendant's Hospital has been a "place or provider of public accommodation" within the meaning of N.Y.C. Admin. Code § 8-102.

88. Under the NYCHRL, places of public accommodation are required to make reasonable accommodations for persons with disabilities, and may not "refuse, withhold from or deny to such [disabled] person the full any equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, facilities or privileges of the place or provider of public accommodation[.]" N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).

89. Additionally, under the NYCHRL, places of public accommodation must "provide a reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

90. Defendant discriminated against Plaintiff, on the basis of her disability, in violation of the NYCHRL.

91. Plaintiff is therefore entitled to seek and recover declaratory and injunctive relief, and nominal, compensatory, and punitive damages for the injuries and loss she sustained by Defendant's discriminatory conduct as hereinbefore alleged pursuant to N.Y.C. Admin. Code § 8-502(a), and attorneys' fees, costs and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Samantha Diaz respectfully requests that this Court:

A.  Enter a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure, stating that Defendant's policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Section 1557 of the ACA, the NYHRL, the NYCRL, and the NYCHRL;

B.  Issue an injunction forbidding Defendant from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals or their companions meaningful access to, and full and equal enjoyment of, Defendant's facilities, services, or programs;

C.  Issue an injunction ordering Defendant to:

  i.  develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, when other means are not effective one will be provided as soon as practicable in all services offered by Defendant;

  ii. develop, implement, promulgate, and comply with a policy to ensure that Defendant will notify individuals who are deaf and hard of hearing of their right to effective communication; including posting explicit and clearly marked and worded notices that Defendant will provide sign language interpreters upon request to ensure effective communication with deaf or hard of hearing persons;

  iii. develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate

17

          method under the circumstances, recognizing that the Video Remote Interpreting system is not appropriate in all medical situations;

    iv.    create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

    v.    train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA, NYHRL, NYCRL, and NYCHRL;

D. Award to Plaintiff:

    i.    Compensatory damages under the ACA, NYHRL, and NYCHRL;

    ii.    Punitive damages under the NYCHRL;

    iii.    Statutory damages under the NYCRL;

    iv.    Nominal damages;

    v.    Reasonable costs and attorneys' fees under the ACA and NYCHRL;

    vi.    Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

    vii.    Any and all other relief that this Court deems just and appropriate.

Dated: November 1, 2021                          Respectfully submitted,

                                                  EISENBERG & BAUM, LLP

                                                  By: _____
                                                  Andrew Rozynski, Esq.
                                                  24 Union Square East, Penthouse
                                                  New York, NY 10003
                                                  (212) 353-8700
                                                  ARozynski@eandblaw.com
                                                  *Attorneys for Plaintiff*